## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DANIEL F. CARDARELLI,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No.: 09-11253-RGS** |
| | : | |
| **THE MASSACHUSETTS BAY** | : | |
| **TRANSPORTATION AUTHORITY,** | : | |
| **et al.,** | : | |
| **Defendants.** | : | |
| | : | |

## DEFENDANT THOMAS O'LOUGHLIN'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

As reasons for requesting dismissal as a party to this action, O'Loughlin states the following:

### I.    STANDARD OF REVIEW

The travel begins with the appropriate lens through which this dispositive request is to be viewed. Rule 12 (b) (6) of the Federal Rules of Civil Procedure authorizes the dismissal of actions which "fail to state a claim upon which relief may be granted." In evaluating such a motion, testing the legal sufficiency of the pleading, the complaint is to be construed in the light most favorable to the plaintiff, meaning all well-pleaded allegations are to be taken as true and that the plaintiff is conferred with the benefit of all reasonable inferences that may be drawn from such allegations. *See Cooperman v. Individual Inc.*, 171 F.3d 43, 46 (1st Cir. 1999); *Figueroa v. Rivera*, 147 F.3d 77, 80 (1st Cir. 1998).

Through recent decisions, additional judicial gloss has been placed upon this standard by the United States Supreme Court, as well as by lower federal courts, including the First Circuit Court of Appeals. More specifically, it has been made clear that in order for a matter to survive a

motion to dismiss advanced pursuant to Fed.R.Civ.P. 12 (b) (6), the factual allegations contained in the operative pleading must "possess enough heft" to set forth "a plausible entitlement to relief." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1ˢᵗ Cir. 2008) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Dismissal for failure to state a claim is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi*, 513 F.3d at 305 (citations omitted). Put differently, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . .[This standard] asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S.Ct. 1937, 1949 (2009) (internal citations and quotation marks omitted).

Very recently, the United States Supreme Court had occasion to expound further upon this standard of review in *Ashcroft*. There, building upon its 2007 decision in *Twombly*, the Supreme Court made clear that the pleading standard constructed by Fed.R.Civ.P. 8 (a) (2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . .[and a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. . . . Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. . . ." *Ashcroft*, ___ U.S. at ___, 129 S.Ct. at 1949 (internal citations, punctuation and quotation marks omitted).

*Ashcroft* also identified what were described as the two "working principles" that

undergirded the decision in *Twombly*. *Id.* These principles functionally amount to a two step

progression that a reviewing court is to engage in when considering a challenge to the viability of

a complaint. The first step of the progression is a task of excision: because, in the context of a

motion to dismiss, only well-pleaded factual allegations are to be taken as true and not subject to

contestation, a court properly should remove from the analysis any legal conclusions, including

those couched as factual assertions, as well as any threadbare recitals of the elements of a cause

of action supported by mere conclusory statements. *Id.*, 1949-50 (citations omitted).[1] This stage

of the progression is largely consistent with Circuit precedent that predates *Ashcroft* and

*Twombly*. *See Edsall v. Assumption College*, 367 F.Supp.2d 72, 76 (D.Mass.2005) (citing

*Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66 (1ˢᵗ Cir. 2004)) (a court

"may not uphold a complaint based solely on 'bald assertions, unsupportable conclusions, and

opprobrious epithets.'"); *see also Jones v. City of Boston*, 135 Fed.Appx. 439, 2005 WL 1389966

(1ˢᵗ Cir. June 14, 2005) (unpublished opinion) (affirming dismissal of malicious prosecution

claims, in part, upon the complaint's "oblique contention[s]" alleging malicious prosecution).

Turning to the second stage of the progression, a reviewing court is to engage in a

"context-specific task" that requires "draw[ing] on its judicial experience and common sense" in

order to analyze the well-pleaded factual assertions and to consider whether the complaint sets

forth a plausible claim for relief. *Id.*, 1950 (citations omitted). If the complaint does no more

---

[1] For example, the *Ashcroft* Court described as conclusory and "not entitled to be assumed
true" the allegations that certain defendants "knew of, condoned, and willfully and maliciously
agreed to subject [the plaintiff]" to improper treatment "as a matter of policy, solely on account
of [the plaintiff's] religion, race, and/or national origin and for no legitimate penological
interest." *Id.*, 1951 (citations omitted). The Court similarly refused to consider, without further
factual enhancement, the allegations that a particular defendant was the "principal architect" of
the policy while another defendant was "instrumental" in its adoption and implementation. *Id.*
(citations omitted).

than lead to an inference of the *possibility* of misconduct, it has failed to state a claim and is

subject to dismissal. *Id.* (citations omitted).[2]  The standard cast, a review of the plaintiff's claims

against O'Loughlin may follow.

## II.     THE ASSERTIONS MADE IN THE COMPLAINT

### A.     The Plaintiff's General Allegations

Broadly put, the allegations contained within the plaintiff's 125 page, 431 paragraph

pleading comprise a constellation of perceived workplace slights, annoyances, grievances and

instances of alleged harassment and retaliation which, the plaintiff contends, extend almost as far

in the past as the commencement of his time as a police officer with the Massachusetts Bay

Transportation Authority ("the MBTA"). *See generally* Compl.; *see also* Compl., ¶ 19

(referencing the plaintiff's tenure of approximately twenty years as a police officer with the

MBTA); Compl., ¶¶ 20-23 (referencing matters from 1993 as forming a foundation for claims

now advanced).  In large part, reliance here is placed on the setting of the factual landscape as set

forth within the MBTA's motion to dismiss, a filing which laudably summarizes and helpfully

categorizes the plaintiff's allegations into ten pages what it took the complaint thirty-three pages

to set forth. *Compare* Mem. in Support of Motion to Dismiss of the MBTA, et al., pp. 2-11 *with*

Compl., pp. 5-38.

Desirous of not burdening the Court with unnecessary repetition, the following rendition

of factual allegations seeks simply to highlight those assertions pertaining to O'Loughlin that are

contained within the plaintiff's lengthy pleading, or within the motion to dismiss the record by

means of the attachments to the MBTA's motion to dismiss.  As limned in that record,

---

[2]This two step progression is precisely the analysis engaged in by the *Ashcroft* Court.  *See id.*, 1951-52.

O'Loughlin became employed by the MBTA as its Chief of Police in or about October, 1997 and

served in that capacity until his departure to become Chief of Police in Milford, Massachusetts in

July, 2002. *See* Attachment I to Affidavit of Daniel S. Tarlow, appended to Mem. in Support of

Motion to Dismiss of the MBTA, et al.  Given that duration of service, and in light of the fact

that the plaintiff's tenure with the MBTA Police Department both predated and postdated

O'Loughlin's time there, this Court appropriately may excise the bookends of the allegations

made by the plaintiff, insofar as a great many of the plaintiff's assertions refer to events and

alleged grievances that occurred before O'Loughlin arrived, or after he left, and the complaint

otherwise contains no allegation whatsoever that O'Loughlin personally was involved in any

such events on the spectrum either before he was employed by the MBTA or since his departure.

*See, e.g.,* Compl., ¶¶ 20-23 (section entitled "1993 Organized Crime Investigation" and

referencing events taking place in or about 1993); Compl., ¶¶ 68-88 (section entitled "Perjured

Search Warrant - Che Miranda Case" and referencing events beginning in April, 2004); Compl.,

¶¶ 109-133 (section entitled "2005 Internal Affairs Investigation/Second Psych Evaluation" and

referencing events from 2005 through 2006); Compl., ¶¶ 134-144 (section entitled "Further

Harassment at Roll Calls" and referring to events from March, 2007 through the time of the filing

of the complaint).

### B.   The Sections of Factual Assertions That Reference Events During O'Loughlin's Tenure

That task completed, there remain five sections of the complaint's factual assertions that,

simply by matter of chronology and not necessarily by substantive allegation against O'Loughlin,

took place within the period of time that O'Loughlin was the MBTA Chief of Police.

### 1.     "The Homicide Investigation Cover-Up"

First, in the complaint the plaintiff alleges that, in August, 1998, he "received a call from an unidentified source who reported that a homicide previously prosecuted by the MBTA Transit Police Department had been 'fixed. . . .'" because the suspects were relatives of someone in the MBTA administration. Compl., ¶¶ 24-25. As is revealed in an attachment to the MBTA motion to dismiss, the homicide at issue took place in 1991. *See* Attachment B to Affidavit of Daniel S. Tarlow, appended to Mem. in Support of Motion to Dismiss of the MBTA, et al. The plaintiff alleges that he launched his own investigation into this matter and, approximately five weeks later, he submitted a report of his findings up the chain of command to O'Loughlin. *See* Compl., ¶ 27.

The complaint goes on to indicate that, three days after his report was submitted, the plaintiff was informed that an investigation would be conducted, which would involve the plaintiff as an investigator. Compl., ¶ 32. Other than indicating that a report was submitted through the chain of command to O'Loughlin, the complaint makes absolutely no mention of any other action, or any omission of O'Loughlin in connection with this issue, although the complaint does allege that the plaintiff heard, second-hand, from Detective Mark Gillespie that a fellow officer, Peter Pasciucco, had said that the "administration" planned to discredit the plaintiff by sending him to a psychiatric evaluation. Compl., ¶ 33. When, the plaintiff says, nothing was done to Pasciucco for this "threat" and when he became aware that Pasciucco had involved himself in the investigation, the plaintiff refused to continue his involvement in the "sham" investigation because he "did not want his name associated with [it]." Compl., ¶¶ 34-38.

2.    **"Unauthorized Use of Seized Vehicles"**

Second, the plaintiff alleges that, on October 15, 1998, he "discovered" that O'Loughlin took a seized vehicle from the United States Drug Enforcement Agency and provided it to a civilian friend for personal use.[3] *See* Compl., ¶ 39. The complaint states that the plaintiff immediately understood this action to be in violation of law and reported the matter to the DEA who, the plaintiff says, ordered that the vehicle be returned to headquarters. *See* Compl., ¶¶ 40-41. The plaintiff concludes this section of the complaint by alleging that, in retaliation for his reporting of the matter, within one day he was reassigned to the patrol division and given a walking beat in Dorchester. *See* Compl., ¶ 42. Notably, the complaint contains no allegation as to the person responsible for the order of reassignment.

3.    **"1996 Case Fixing/Prosecutorial Conduct"**

Third, the plaintiff claims that, after a traffic stop and the issuance of a citation and criminal summons to a motor vehicle operator in June, 1996, during which the operator indicated that he would have the matter "fixed[,]"the plaintiff never received notice of the matter being presented to a court and, after an initial report to a supervising sergeant brought no relief, the prosecution only was pursued once a second complaint was made by the plaintiff to another superior officer. *See* Compl., ¶¶ 43-47. The plaintiff alleges that the prosecution was lost because, by the time it was pursued, the matter was untimely and, further, the plaintiff claims to have uncovered evidence of twelve to fifteen other cases similar to his that had been handled improperly. *See* Compl., ¶¶ 48-50. Going still further, the plaintiff alleges that the jurist handling his citation matter ordered that the Office of the Attorney General conduct an

_____

[3]Of note, next week will mark the eleventh anniversary of this supposed "discovery" by the plaintiff.

investigation into the matter. *See* Compl., ¶ 50. When the plaintiff did not become aware of

such an investigation being commenced, he inquired of Defendant Anne McCall on the topic and

purportedly was told that "O'Loughlin had pulled some political strings to stop the investigation

by the Attorney General's Office, and that [the plaintiff] better never bring the subject up again."

Compl., ¶ 51. Then going directly to the Office of the Attorney General, the plaintiff reported the

allege case fixing and homicide cover-up to two Assistant Attorneys General in the Public

Corruption Unit, only to later be informed that the Unit "had no interest in pursuing either

investigation." Compl., ¶¶ 52-53.

### 4.    "1999 Internal Affairs Investigation - Mateo Case"

Fourth, the plaintiff alleges that, in October, 1999, he was made aware of an internal

affairs investigation arising out of two arrests that the plaintiff and his partner had made that

month for attempted homicide. *See* Compl., ¶¶ 54-56. The plaintiff alleges that this

investigation was not premised on any suspicion of wrongdoing on his part, but that it was

commenced in retaliation for his prior reporting of the homicide investigation cover-up and the

alleged case fixing to his superiors and to the Office of the Attorney General. *See* Compl., ¶¶ 57-

58. In the drafting of his report concerning his actions in the October, 1999 arrest that was the

subject of the investigation, ostensibly based on his belief that there existed a nefarious

motivation undergirding the internal affairs review, the plaintiff referenced the alleged homicide

cover-up and "reiterated his belief that said cover-up was perpetrated by police officers who were

still in the employ of the MBTA Transit Police Department." Compl., ¶ 58.

After his report was submitted, the plaintiff was called before Defendants Thomas

Kamola and Anne McCall for an interview, during which the plaintiff claims that he was

informed that the cover-up was a mere "rumor" and that an investigation had revealed that there had been no such cover-up; the plaintiff further claims that he was told that if he continued to raise the issue, that he would be subjected to discipline. *See* Compl., ¶¶ 59-61.[4]  Finally, the plaintiff claims that, upon reporting to work the next day, on February 11, 2000, he was approached by a sergeant and directed to remove an embroidered motorcycle emblem from his uniform sleeve because, at that time, the plaintiff was not in the motorcycle unit; the plaintiff claims that this constituted disparate treatment because other officers were not directed similarly to remove their emblems and was designed to embarrass the plaintiff. *See* Compl., ¶¶ 64-67.

Of critical note for present purposes, although this incident allegedly occurred within O'Loughlin's tenure, this section of the complaint contains not a single mention of O'Loughlin, nor does it include a solitary allegation that he was involved in any of the events associated with this internal affairs investigation or the directive that the plaintiff remove his motorcycle emblem. *See* Compl., ¶¶ 54-67.

### 5.    "Additional Harassment"

Fifth, the plaintiff alleges that, from August, 2000 through October, 2002,[5] he was subjected to instances of harassment, largely taking the form of broadcast messages on the departmental paging system indicating that the plaintiff was a "rat"; that he was in need of a

---

[4]Rather curiously, the plaintiff alleges that the investigation "was nothing more than a sham investigation perpetrated by his superiors in order to provide them with an opportunity to threaten a job action against [the plaintiff] if he continued to pursue his investigation of the murder cover-up." Compl., ¶ 63.  The logic in this assertion seems, at best, strained to the point of breaking insofar as it was the *plaintiff*, and not any of his superiors, who interjected the supposed homicide investigation cover-up into the mix.

[5]As noted, O'Loughlin left the MBTA in July of 2002. *See* Attachment I to Affidavit of Daniel S. Tarlow, appended to Mem. in Support of Motion to Dismiss of the MBTA, et al.

"shrink"; that he was a homosexual; and that he had killed his wife, who died in 1992. *See*

Compl., ¶¶ 89-92. The plaintiff further asserts that he was mocked when, in February, 2002, two

men in jumpsuits and identifying themselves as exterminators approached him and said that they

had been sent by the administration upon complaints of a large rat running around the plaintiff's

sector. *See* Compl., ¶¶ 94-95. Also in 2002, the plaintiff alleges that persons making allegations

about the plaintiff similar to the pager messages were posted at the MBTA headquarters and

other properties and a posting also was made on an internet site frequented by law enforcement

personnel from the Boston area. *See* Compl., ¶¶ 96-100. In October, 2002, the plaintiff spoke

with an Assistant District Attorney to report the harassment and, it is asserted, that Assistant

District Attorney contacted a specialist in computer forensics to commence an investigation into

the internet postings. *See* Compl., ¶ 105. That investigation, the plaintiff says, revealed the

origins of the posting to be a computer in the main dispatch area of the MBTA Police

Department headquarters but, before the poster could be discovered, O'Loughlin directed that the

investigation be terminated. *See* Compl., ¶¶ 106-108.

In this regard, the complaint itself suffers from a serious defect, in light of the plaintiff's

allegation that this investigation commenced in October, 2002; *see* Compl., ¶ 105; and given that

O'Loughlin left the MBTA in July, 2002. *See* Attachment I to Affidavit of Daniel S. Tarlow,

appended to Mem. in Support of Motion to Dismiss of the MBTA, et al.

## III.    ARGUMENT

Deriving from that predicate of allegation, the complaint seeks to advance eight causes of

action against O'Loughlin, namely, a claim: (1) brought pursuant to 42 U.S.C. § 1983 for alleged

violations of the plaintiff's first amendment, as incorporated through the fourteenth amendment,

right to free speech; *see* Compl., ¶¶ 150-156 (Count II); (2) alleging the same constitutional

deprivation but adding that it was accompanied by threats, intimidation and coercion, brought

pursuant to the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H-I; *see* Compl.,¶¶ 157-162

(Count III); (3) alleging that O'Loughlin negligently inflicted emotional distress upon the

plaintiff; *see* Compl., ¶¶ 163-166 (Count IV); (4) alleging that O'Loughlin intentionally inflicted

emotional distress upon the plaintiff; *see* Compl., ¶¶ 167-171 (Count V); (5) alleging that

O'Loughlin defamed the plaintiff; *see* Compl., ¶¶ 172-176 (Count VI); (6) alleging that

O'Loughlin slandered or libeled the plaintiff; *see* Compl., ¶¶ 177-182 (Count VII); (7) that

O'Loughlin engaged in a civil conspiracy with the other defendants to obstruct justice, prevent

the plaintiff's disclosure of their activities and otherwise to harm the plaintiff; *see* Compl., ¶¶

183-188 (Count VII);[6] and, (8) that O'Loughlin violated 18 U.S.C. §§ 1962-1964, components of

the portion of the United States Code colloquially known as the Racketeer Influenced and

Corrupt Organizations Act or "RICO[.]"

 In broad stroke, the plaintiff's claims against O'Loughlin fail as a matter of law given that

they are time-barred, are barred statutorily or otherwise fail to state a claim upon which relief

may be granted.[7]  O'Loughlin is entitled to an entry of judgment in his favor, and an award of

fees and costs as a consequence.

### A. The Plaintiff's Causes of Action are Barred by the Applicable Statutes of Limitation

 To begin, each of the plaintiff's claims is hopelessly time-barred.  "Affirmative defenses,

---

 [6]The complaint erroneously styles two separate causes of action as a "Count VII[.]"

 [7]Again, O'Loughlin joins, to the extent applicable, in the argument presented in the motion to dismiss previously filed on behalf of the MBTA and numerous other individual defendants.

such as the statute of limitations, may be raised in a motion to dismiss under Federal Rule of

Civil Procedure 12 (b) (6), provided that the facts establishing the defense [are] clear on the fact

of the plaintiff's pleadings." *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321

(1st Cir. 2008) (citations and internal punctuation omitted).

As to the plaintiff's first claim against O'Loughlin, advanced pursuant to § 1983 and

alleging a constitutional deprivation, because § 1983 does not itself contain a limitations period,

the forum state's statute of limitations for personal injury claims is borrowed for purposes of §

1983. *Rodriguez-Garcia v. Municipality of Caguas*, 354 F.3d 91, 96 (1st Cir. 2004) (citation

omitted). In this instance, the limitations period is provided by G.L. c. 260, § 2A, which

provides that a claim for personal injury shall be commenced within three years of the accrual of

a cause of action. The same statutory provision sets forth the limitations period for all tort claims

meaning, in this instance, that the three year period imposed by G.L. c. 260, § 2A also applies to

Counts IV, V and VII of the complaint asserting, respectively, claims of the negligent infliction

of emotional distress, the intentional infliction of emotional distress and civil conspiracy. As to

the plaintiff's claim pursuant to the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H-I; *see*

Count III; a three year period also is imposed by operation of G.L. c. 260, § 5B, which

encompasses civil rights causes of action. The plaintiff also had three years within which to

advance his defamation and slander/libel claims; *see* Counts VI and VII[8]; pursuant to G.L. c. 260,

§ 4. Finally, the plaintiff's federal RICO claim is controlled by a four year limitations period.

*See Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156 (1987). In summary,

all of the plaintiff's claims operate under a three year limitations period save for one claim with a

---

[8]The "first" Count VII.

four year window.

The next stage in the analytical progression for this Court, given that the accrual of a cause of action often is statutorily referenced but not statutorily defined, is to determine the accrual dates for the plaintiff's claims advanced against O'Loughlin. *See, e.g., Riley v. Presnell,* 409 Mass. 239, 243 (1991) (legislature has chosen not to define "when a cause of action accrues for purposes of the statute of limitations. That determination, therefore, 'has long been the product of judicial interpretation in this Commonwealth.'" (citations omitted)). Beginning with the plaintiff's § 1983 claim, although the law of the forum state is referenced in order to provide the applicable prescriptive period, "federal law determines the date on which the claim accrued." *Rodriguez-Garcia,* 354 F.3d at 96. On that issue of accrual, the limitations period "begins to run when the plaintiff 'knows or has reason to know of the injury which is the basis for his claim.'" *Id.,* at 96-97 (citations omitted). A similar analysis exists for the plaintiff's RICO claim. *See Klehr v. A.O. Smith Corp.,* 521 U.S. 179 (1997) (discussing accrual for a civil RICO claim and potential accrual rules, including injury discovery accrual, injury and pattern discovery accrual and last predicate act accrual; rejecting viability of last predicate act accrual but otherwise not resolving the accrual question).[9]

Moreover, the identical standard for accrual is to be applied to each of the plaintiff's various state causes of action. *See Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 207 (1990) ("the statute of limitations starts to run when an event or events have occurred that were reasonably

---

[9]As will be discussed factually subsequently in this memorandum, it is of no moment whether the proper accrual analysis for the plaintiff's RICO claim is accrual as of the date of injury discovery or the date of discovery of injury and pattern since, in either scenario, the plaintiff's own pleading admissions make clear the fact that he was well aware of the claimed basis for his RICO claims well before July, 2005 which, given his July, 2009 commencement of this action, renders such allegations untimely as a matter of law.

-13-

likely to put the plaintiff on notice that someone may have caused her injury"); *see also Flynn v. Associated Press*, 401 Mass. 776, 780 (1988) ("[i]n determining when a cause of action 'accrues,' we are guided by the principle that 'a cause of action accrues on the happening of an event likely to put the plaintiff on notice'" (citations omitted)); *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.*, 396 Mass. 818, 824 (1986) ("a cause of action accrues on the happening of an event likely to put the plaintiff on notice").  Moreover, it matters not whether a plaintiff is aware of the precise contours of potential causes of action, because this standard not only is objective in nature, but "[t]he 'notice' required is not notice of every fact which must eventually be proved in support of the claim . . . .Rather, 'notice' is simply knowledge that an injury has occurred." *Flynn*, 401 Mass. at 780 (citations omitted).  Collectively, these cases stand for the proposition that, once an individual has been put on notice that "a particular act of another person may have been a cause of harm," a "duty of inquiry" has been imposed and the limitations period commences. *Bowen*, 408 Mass. at 206; *see also American Glue & Resin, Inc. v. Air Products & Chemicals, Inc.*, 835 F.Supp. 36, 46 (D.Mass. 1993) (interpreting Massachusetts law and collecting cases).

The inquiry for this Court is straightforward in that the admissions made in the plaintiff's complaint make pellucid the fact that, as to O'Loughlin,[10] the plaintiff was more than well aware of the events that now form the foundation for his claims here, as well as the purported injuries that he now complains flow therefrom, as the events were transpiring.  For some reason, the plaintiff chose to slumber on these claims, at times for more than a decade, as they accrued and that neglect and delay now prove fatal to each of his claims.

---

[10]Indeed, as to the other named defendants as well.

For example, in connection with the "homicide investigation cover-up"; *see* Section II.B.1 of this memorandum; the plaintiff quite obviously was aware of the alleged "threat" made by Pasciucco in the latter part of 1998 because he complained about it and, convinced that the investigation was a "sham[,]" he withdrew himself from involvement. If any claims arose from that nucleus of claimed fact, those claims accrued in 1998 and, by the time of the plaintiff's filing of this complaint in *2009*, were time-barred not by a matter of days or weeks, but a great many years. Similarly, all of the plaintiff's allegations concerning his reassignment to a walking beat in the patrol division as a result, so he says, of his report to the DEA of O'Loughlin's actions with respect to a seized motor vehicle are time-barred because the plaintiff was aware of the facts that he now asserts in his complaint, and his claimed injury, in October, 1998. *See* Section II.B.2 of this memorandum. The same, actual knowledge of the now asserted facts and claimed injuries,[11] can be said for the plaintiff's claims based upon the asserted "case fixing"in 1996; *see* Section II.B.3 of this memorandum; the internal affairs investigation taking place in October, 1999; *see* Section II.B.4 of this memorandum; as well as the "additional harassment" that the plaintiff complains of from August, 2000 through October, 2002. *See* Section II.B.5 of this memorandum. In point of fact, the application of the various statutes of limitation periods here can be distilled to a very simple and incontrovertible set of propositions: *all* of the plaintiff's allegations against O'Loughlin revolve around his time as MBTA Chief of Police; O'Loughlin left the MBTA in July, 2002; the longest limitations period for a claim advanced by the plaintiff is four years, with all others operating pursuant to a three year window; the plaintiff's complaint

---

[11]Even if, contrary to the statements made in his operative pleading, the plaintiff now claims subjective unawareness of an injury at the time of these events, this Court should remain mindful that the standard for accrual is an objective test.

-15-

was not filed until late July, 2009, or *seven years* after O'Loughlin left the MBTA.  As it is not

subject to dispute that the plaintiff's claims against O'Loughlin were filed years after the various

limitations periods expired, the plaintiff's claims are time-barred and judgment should enter in

favor of O'Loughlin.

**B.     The Plaintiff's Claims Suffer From Various Other Fatal Flaws**

Although the statutes of limitation inquiry is, for the reasons discussed, dispositive as to

all claims advanced against O'Loughlin, the plaintiff's claims against O'Loughlin suffer from

sundry additional legal deficiencies which impact the causes of action collectively or

individually.  First, to begin, impacting the factual underpinnings for each of the plaintiff's

claims, of the five categories of factual allegation made by the plaintiff in his complaint that

temporally coincide with O'Loughlin's tenure as Chief of Police, there are categories that, in

disregard for the critical pleading function of attempting to set out information related to the

litigation inquiries of "who did what to whom, when, where, and why"; *Educadores*

*Puertorriquenos en Accion*, 367 F.3d at 68 (1st Cir. 2004); the plaintiff simply has failed to allege

that O'Loughlin did anything to the plaintiff, or did anything at all, that could subject him to

liability.  For example, in the "homicide investigation cover-up" category of allegation, the

plaintiff alleges that he submitted a report through the chain of command to O'Loughlin, but

otherwise makes no reference to any actions that O'Loughlin took that were improper or

inappropriate; indeed, the complaint does not allege that O'Loughlin did anything at all.  *See*

Section II.B.1 of this memorandum.  Similarly, in the matter involving the 1999 internal affairs

investigation into the plaintiff, there is not a single mention of O'Loughlin.  *See* Section II.B.4 of

this memorandum.  To the extent that any of the plaintiff's claims are premised upon those

categories of allegation, the plaintiff has failed to meet the threshold level of allegation necessary to sustain such claims.

Second, on an intertwined point, with respect to Counts V and VI of the complaint, alleging defamation and slander/libel,[12] the plaintiff has failed to state a claim. "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community." *Grande & Sons, Inc. v. Chace*, 333 Mass. 166, 129 N.E.2d 898, 899 (1955). To sustain such a claim, a plaintiff further must demonstrate that the words "discredit[ ] the plaintiff in the minds of any considerable and respectable class of the community. " *Muchnick v. Post Pub. Co.*, 332 Mass. 304, 125 N.E.2d 137, 138 (1955). It has been said that summary disposition in the area of defamation is preferred insofar as "[t]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Cefalu v. Globe Newspaper Co.*, 8 Mass.App.Ct. 71, 74 (1979) (citations omitted).

As the Massachusetts Appeals Court has noted, defamation is a "traditionally disfavored action" and the Supreme Judicial Court has intimated that it might well follow federal guidance requiring a stricter standard for complaints of defamation. *Sumadi v. Liberty Mutual Ins. Co.*, 62 Mass.App.Ct. 1103, 2004 WL 2185424, *2 (2004); *see also Andresen v. Diorio*, 349 F.3d 8, 16-17 (1ˢᵗ Cir. 2003) (citations omitted) (concluding that Massachusetts has instituted a heightened pleading standard for defamation causes of action, which minimally include the precise wording of at least one sentence of the alleged defamatory statement and the nature and approximate dates

---

[12]It is not known why the plaintiff has cabined a defamation claim as separate from his slander/libel claim. Defamation is a term that encompasses as subsets the concepts of both libel (written defamation) and slander (verbal defamation). *See Draghetti v. Chmielewski*, 416 Mass. 808, 812 n.4 (1994).

of publication); *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 430-31 (1991) (collecting cases supporting a heightened standard of pleading but indicating that resolution of the question in that context was unnecessary insofar as the defamatory statements at issue were set forth verbatim and their publication and relevant extrinsic facts were set forth with particularity, satisfying heightened pleading requirements). In fact, in *Sumadi*, the Appeals Court concluded that a stricter standard for pleading was appropriate for Massachusetts courts to apply and, in considering a claim of defamation materially identical to the one presented here, concluded that the claim could not survive a motion to dismiss. *Id.*, *1 ("The Plaintiff has not set forth the false statement nor does she allege facts establishing the essential element of publication to a third party." (citations omitted)).[13] Here, the plaintiff has not alleged that O'Loughlin said *anything* about the plaintiff, nor has the plaintiff even alleged that O'Loughlin had any role in the creation or dissemination of the various postings that form the basis for this claim. *See* Section II.B.5 of this memorandum.

Third, the complaint is quite clear in stating that the plaintiff is pursuing claims against O'Loughlin in both his official and individual capacities. *See* Compl., p.1. To the extent that the plaintiff, in Counts IV (intentional infliction of emotional distress); V (defamation); VI (slander and libel) and VII (civil conspiracy), seeks extent to advance intentional tort claims against O'Loughlin in his official capacity, those claims are barred statutorily. Massachusetts General Laws c. 258, §§ 1 et seq., was enacted for the purpose of removing the defense of governmental

---

[13]Such a pleading standard also is in harmony with statutory authority on point. *See* G.L. c. 231, § 91 ("In an action of slander or libel . . . [i]f the plaintiff proposes to introduce evidence of statements of the defendant *other than those contained in his pleadings*, he shall give the defendant written notice of such intention, specifying the date and content of each such statement, at least fourteen days before trial begins, or earlier if the court so orders . . . ."). (Emphasis added).

immunity for the Commonwealth, municipalities and other governmental subdivisions in certain manner of tort actions. *See Murphy v. Town of Chatham*, 41 Mass.App.Ct. 821, *rev. denied* 424 Mass. 1106 (1996).  Massachusetts General Laws c. 258, § 10, however, provides that such a waiver of immunity shall not take place in certain instances, including "any claim arising out of an intentional tort, including . . . intentional mental distress, . . . libel [and] slander." G.L. c. 258, § 10 (c); *see also Swanset Development Corp. v. City of Taunton*, 423 Mass. 390 (1996) (city could not be rendered liable for intentional interference with contractual or business relation). Such an exception to the waiver of governmental immunity in the case of intentional torts extends beyond the Commonwealth, municipalities and other governmental subdivisions, and has been held to encompass intentional tort claims against governmental employees acting in their official capacities. *Howcroft v. City of Peabody*, 51 Mass.App.Ct. 573, 592-94, 596 (2001) (referencing G.L. c. 258, § 10 (c) and concluding that municipality could not be liable for tort of intentional infliction of emotional distress; concluding further that "like claims for damages against the other defendants in their official capacities were properly dismissed." (citations omitted)); *see also Saxonis v. City of Lynn*, 62 Mass.App.Ct. 916, 918 (2004) (rescript) (concluding that intentional interference claim against school principal in official capacity barred by G.L. c. 258, § 10 (c)).  Accordingly, insofar as intentional tort claims are advanced against O'Loughlin in his official capacity, the claims are barred and dismissal is appropriate.

Fourth, the plaintiff's claim against O'Loughlin for the negligent infliction of emotional distress founders as a matter of law.  By operation of G.L. c. 258, a public employee, such as O'Loughlin, cannot be sued for negligence while acting within the scope of his employment. *See* G.L. c. 258, § 2 (". . . no such public employee or the estate of such public employee shall be

liable for any injury or loss of property or personal injury or death caused by his negligent or

wrongful act or omission while acting within the scope of his office or employment . . . .";

providing further that only public employers can be liable based upon such allegations).  Here, a

review of the complaint reveals that all of the actions of O'Loughlin as to which the plaintiff

registers complaints were actions taken while he was in the role of Chief of Police for the MBTA

, consequently, the negligent infliction claim is barred and dismissal is appropriate.[14]

## IV.  CONCLUSION

WHEREFORE, for the reasons discussed, O'Loughlin requests that he be dismissed as a

party to this litigation.

> DEFENDANT THOMAS O'LOUGHLIN,
> By his attorneys,
>
>
> /s/ Andrew J. Gambaccini
> Austin M. Joyce, BBO #: 255040
> Andrew J. Gambaccini, BBO #: 654690
> Reardon, Joyce & Akerson, P.C.
> 4 Lancaster Terrace
> Worcester, Massachusetts 01609
> 508.754.7285

---

[14]For additional reasons as to why the plaintiff's various claims fail as a matter of law,
O'Loughlin refers this Court to the argument presented in the motion to dismiss filed by the
MBTA and various other individual defendants.

-20-