UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-CV-11253-RGS

DANIEL F. CARDARELLI

v.

THE MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,
JOSEPH CARTER, THOMAS O'LOUGHLIN, JOHN A. MARTINO,
DELORES FORD MURPHY, THOMAS KAMOLA, ANNE McCALL,
KENNETH SPRAGUE, PETER PASCIUCCO, ROBERT POWERS,
PAUL BYRNE, PRISCILLA JACKSON, and WILLIAM KILLORAN,
all named in both their individual and official capacities

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

April 7, 2010

STEARNS, D.J.

On July 28, 2009, Daniel Cardarelli, an officer with the Massachusetts Bay
Transportation Authority Transit Police Department (Department), filed this epic 125-page
Complaint against the Massachusetts Bay Transportation Authority (MBTA), fellow officers
past and present, and other MBTA employees, for alleged reprisals – serial, episodic,
concerted, and unilateral – undertaken because of "his efforts to shed light on wrongdoing
within the [D]epartment."  The MBTA and defendants Joseph Carter, John A. Martino,
Dolores Ford Murphy, Thomas Komola, Anne McCall, Kenneth Sprague, Peter Pasciucco,
Priscilla Jackson, and William Killoran move to dismiss the Complaint.  Defendants argue
that almost all of Cardarelli's claims are barred by various statutes of limitations, and are
also unsubstantiated by the meandering and diffuse allegations of the Complaint.  Thomas
O'Loughlin, a retired Department Chief, moves separately to dismiss the claims against

him, contending that there are no allegations of any actionable wrongdoing on his part.[1]

Cardarelli opposes both motions, relying on a largely unarticulated "continuing violation"

theory to overcome the limitations barriers.

BACKGROUND

The well-plead allegations of Cardarelli's Complaint will be deemed true for present

purposes.  They are as follows.  Cardarelli is a twenty-year police veteran and current

employee of the Department.  His "troubles" began on September 26, 1998, when he filed

a written report of an alleged cover-up of a homicide at the Ashmont MBTA Station in

Dorchester.[2]  Cardarelli submitted his report through the chain of command to (then) Chief

O'Loughlin.[3]  On September 29, 1998, Deputy Chief William Fleming told Cardarelli that

the Department would conduct an investigation of the cover-up and that Fleming, Lt.

---

[1]On January 19, 2010, Robert Powers and Paul Byrne, the remaining defendants, moved for judgment on the pleadings, also asserting a limitations bar to Cardarelli's claims.  See infra at n.19.

[2]On August 19, 1998, Cardarelli received a call from an unidentified source who told him that MBTA officers had arrested twin brothers, Stephen and Michael Sullivan, for the murder of William Stauss.  The source informed Cardarelli that the case had been "fixed" to insure that the brothers would serve no jail time.  The alleged "fixer" was a relative of the Sullivans highly placed in the MBTA administration.  After approximately five weeks of investigation, Cardarelli drafted a report summarizing his findings that a "cover-up" of the Ashmont Station murder had taken place.

[3]Cardarelli states in his Complaint that on September 27, 1998, Officer Lewis Best, the primary investigator assigned to the Stauss murder case, approached Cardarelli at his desk in the detective unit and confirmed the existence of a cover-up.  Best allegedly showed Cardarelli a copy of the original police report and pointed to the signature on the bottom of the page ("Buckley").  "Best stated that Ellen Buckley, a civilian employee of the Department had erased his complete report and entered her own account of the 'facts' of the case." Compl. ¶ 30.  When Cardarelli inquired whether Best had reported the cover-up to his superiors, Best stated that he had, but that no action had been taken.

Joseph Luechte, and Cardarelli would be the principal investigators.  Detective Mark Gillespie warned Cardarelli (on September 30, 1998), that Pasciucco, with the covert assistance of MBTA higher-ups, intended to force Cardarelli to undergo a psychiatric examination as a pretext for his  termination.  Cardarelli states that when he arrived at work on October 6, 1998, "Pasciucco had taken control of the cover-up investigation and had already begun interviewing witnesses without the participation of Fleming, Luechte or Cardarelli."  Compl. ¶ 36.  On learning of Pasciucco's meddling, Cardarelli refused to participate further in the investigation.  After seeking legal advice from the Patrolman's Association (Union), Gillespie informed Deputy Chief Fleming and Lt. Luechte of the plot.  When "MBTA supervisors" called Pasciucco on the carpet for scheming against Cardarelli, "Pasciucco admitted [the] same to them."  Id. ¶ 35.

On or about October 15, 1998, Cardarelli learned that Chief O'Loughlin had given a "seized" motor vehicle to a friend for personal use.  Cardarelli notified the Drug Enforcement Agency Asset Forfeiture Unit, which ordered the car returned.  The next day, Cardarelli was transferred from the detective unit to the Uniform Patrol Division and assigned to a walking beat in Dorchester.  Cardarelli alleges that this "demotion" was "[i]n direct retaliation for [his] reporting the violation of law by O'Loughlin."  Id. ¶ 42.  Cardarelli states that the demotion "defam[ed] his character" and resulted in a diminution of his pay, as well as a loss of overtime and detail work.  Id. ¶ 149.

On June 28, 1996, Cardarelli issued a traffic citation and criminal summons to a Jonathan Keorner for operating to endanger.  Keorner informed Cardarelli that he was wasting his time, that he (Keorner) was "connected," and that the case would be "fixed."

3

Id. ¶ 44.  Cardarelli eventually found out that no court date had been scheduled and that the prosecution had been scuttled.  Although Cardarelli reported the "fix" to Sgt. Det. Joseph Mastrorilli, no action was taken.  Cardarelli then complained to Sgt. Donald O'Connor, the Department's police prosecutor.  As a result, a criminal complaint was filed.  However, because the citation had not been delivered to the court within six business days as required by Mass. Gen. Laws ch. 90C, § 2, Justice Sally Kelly dismissed the complaint.  Despite the dismissal, Cardarelli states that his testimony persuaded Justice Kelly to order the Attorney General's Office (AGO) to conduct a "full" investigation.

When the AGO did not commence an investigation, Cardarelli reported the matter to Anne McCall, then a Deputy Chief in the Department.  McCall told Cardarelli that no investigation "was ever going to take place."  Id. ¶ 51.  She stated that "O'Loughlin had pulled some political strings to stop the investigation by the AGO."  Id.  McCall warned Cardarelli to "never bring the subject up again."[4]  Id.  Cardarelli then provided Assistant Attorneys General (AAG) Thomas O'Brien and Kurt Schwartz with copies of his report of the cover-up of the Stauss murder and the instances of case-fixing.  After several weeks, Cardarelli asked AAG O'Brien about any follow-up.  AAG O'Brien told Cardarelli that the AGO's Public Corruption Unit had no interest in pursuing the matter.

On October 20, 1999, Cardarelli, together with his partner Willard Predette, arrested two individuals near Harvard Square.  The arrestees, Leonard Mateo and a co-defendant, were charged with attempted homicide.  Both were eventually convicted.  On October 29,

---

[4]Disturbed by these developments, Cardarelli began an investigation into other suspected cases of "fixing of tickets."  Id. ¶ 48.  He discovered approximately 12 to 15 cases that had been "fixed."  Id.

1999, Deputy Chief Nadine Miller, through a subordinate, informed Cardarelli that Internal Affairs was investigating his actions in the Mateo case. Miller ordered Cardarelli to submit a detailed report about the circumstances leading up to the arrest. No similar order was issued to Officer Predette. In his report, Cardarelli referenced the Stauss homicide and his belief that a cover-up had been perpetrated by officers still in active service.

On February 10, 2000, Cardarelli appeared at an Internal Affairs hearing with a Union representative, George Coulter. Present on behalf of the Department were Superintendent Kamola and Deputy Chief McCall. Cardarelli states that the hearing never broached the subject of the Mateo case, but focused instead on Cardarelli's report of a cover-up of the Stauss murder. Kamola told Cardarelli that the cover-up was just "a rumor in the police department," that "the case had been fully investigated," and that it had been "proven that there was no cover-up." Id. ¶ 60. Kamola and McCall then warned Cardarelli "that if he ever mentioned the rumored cover-up to anyone, 'and this means even if you are drinking with your friends in a bar and you mention this case,' that Cardarelli would be 'disciplined' until termination." Id. ¶ 61. Coulter informed Kamola and McCall that there would be no stipulation to these "outrageous terms," because they "were a direct violation of Cardarelli's First Amendment rights." Id. ¶ 62. The hearing then ended.

The following day, when Cardarelli reported for roll call, he was approached by Sgt. Irene Riordan, who informed him that Kamola had ordered her to instruct Cardarelli to remove an embroidered emblem patch from the sleeve of his uniform jacket. The patch had been issued to officers who had successfully completed the Criminal Justice Training

Council motorcycle operation (MOP) course.[5]  Although Cardarelli was not assigned to the

MOP Unit, other graduates of MOP who were not members of the Unit were permitted to

wear the patch.

In August of 2000, a number of anonymous messages disparaging Cardarelli were

broadcast from Department headquarters.[6]  One announced to all officers that "Cardarelli

is a rat." Id. ¶ 91.  Another message stated that "Cardarelli needs to see a shrink."  Id.

Other less explicit broadcasts stated "Homosexual rat in Davis Square," and "The rat at

Davis Square killed his wife."[7] Id.  The messages were transmitted over the MBTA Transit

Police pager network as often as three or four times a day, and continued intermittently

through October of 2002.

On February 4, 2002, Paul Byrne, the President of the Union, posted a signed

message on the pager network that stated: "Officer Cardarelli has psychological problems

and needs to see the shrink because he is a nut."[8]  Id. ¶ 93.  Later that day, while filling

out paperwork at the Davis Square Station, Cardarelli was confronted by two men dressed

in jumpsuits who claimed to be "exterminators" responding to reports of "a large rat running

---

[5]Kamola had seen the motorcycle patch on Cardarelli's uniform the day before at the Internal Affairs hearing.  Kamola told Sgt. Reardon that Cardarelli could not wear the patch as he was not a member of the MOP Unit.

[6]All MBTA Transit Police officers are assigned pagers to receive messages from the Department regarding matters such as available details and emergency situations.

[7]On August 12, 1992, Cardarelli lost his wife, Lisa.  He was left a single parent with two young children, then ages three and two.

[8]Cardarelli says that he spoke to Byrne after this transmission and that Byrne admitted to having sent the message over the network.

around Davis Station." Id. ¶ 94.  Later that evening, when Cardarelli reported at South Station for roll call, all of the officers in the room laughed at him.  When Cardarelli asked what was so funny, he was told that the "exterminators" had been sent to the Davis Square Station by MBTA administrators and that he was the rat they wanted to "exterminate." Id. ¶ 95.

During the fourth week of January of 2002, a letter was posted at headquarters and in the Wellington, Malden, and Sullivan Square Stations accusing Cardarelli of having killed his wife.  The letter also asserted that Cardarelli was a homosexual who was actively engaged in sexual misconduct.   The letters were posted in plain view of MBTA passengers.  An unknown person also distributed copies of the letter to officers' mailboxes and taped it to bathroom stall doors at Department headquarters.

On June 28, 2002, a similar letter appeared on the Internet at Guardroom.com, a law enforcement web site and chat room.  The web site is visited by thousands of law enforcement officers in Boston and New England.  As in the January message, the letter asserted that Cardarelli had killed his wife and that he was a homosexual.  The letter also made a reference to Cardarelli's children.  Copies of the Guardroom.com posting were displayed in Department headquarters and in public areas of MBTA stations for four days before being taken down.

On reading the Internet posting, Cardarelli "became physically ill and was forced to leave work due to [his] emotional stress." Id. ¶ 101.  Cardarelli filed a claim for worker's compensation, citing work-related stress.  William Killoran, the Department's Workers' Compensation Case Manager, denied the claim the same day that Cardarelli filed it.  As

a result, Cardarelli was required to use sick leave and vacation time during the month that he was unable to work.  Cardarelli reported the postings and other acts of harassment to Priscilla Jackson, the head of the MBTA's Organizational Diversity Division.  Cardarelli also complained to John Horan, the President of Transportation Workers Union, Local 600. Horan referred the complaints to MBTA General Manager Michael Mulhern, Jackson, and John Dooley (an official in the MBTA Workers' Compensation Division).  No responsive action followed.

In October of 2002, Cardarelli took his complaints to Suffolk Assistant District Attorney Jeremy Silverfine, who contacted a computer forensics specialist, Detective Lt. John McClean of the Medford police.   McClean identified the source of the Internet postings as a computer located in the main dispatch area of Department headquarters. Sgt. John Daly, the Webmaster of Guardroom.com, informed McClean that the web site's chat room had a "password entry system."  Before McClean could identify the password used to post the comments about Cardarelli, O'Loughlin intervened and "shut down the investigation."  Id. ¶ 108.

In April of 2004, Cardarelli learned that Pasciucco had inserted himself into one of Cardarelli's investigations involving a suspect named Miranda.  Cardarelli was the officer in charge of the case.  On one of Cardarelli's days off, Pasciucco executed a search warrant at Miranda's home, seizing incriminating evidence.  Miranda was arrested, and eventually sentenced to a lengthy term in state prison.  Cardarelli believed that Pasciucco's affidavit in support of the Miranda warrant had been "perjured."  Id. ¶ 71. Cardarelli was convinced that "Pasciucco lacked the requisite training and experience to

perform the essential functions and duties of a sworn police officer for the MBTA Transit Police Department." Id. ¶ 73.  In November of 2004, Cardarelli reported his concerns about Pasciucco to Robert Marino, the Union Treasurer.  Cardarelli asked that the Union provide him with legal counsel to pursue his complaints against Pasciucco.  Marino referred the request to then Union President Robert Powers.  While declining to provide Cardarelli with counsel, Powers forwarded Cardarelli's allegations to Internal Affairs.

A day later, Cardarelli was asked to meet with Internal Affairs investigators Sprague and Martino.  Powers and Michael Flanagan represented the Union at the hearing.  The interview of Cardarelli was tape-recorded.  Sprague informed Cardarelli that he had been accused of making threats against the family of Deputy Chief Fleming, which had been witnessed by Marino.  Cardarelli insisted that Marino be summoned to verify the allegations.  When Marino was told of the accusation, he responded "that he had no idea what they were talking about, and that Cardarelli had not threatened anyone during [their] conversation." Id. ¶ 78.  Cardarelli was then ordered out of the room, while Sprague met privately with Powers, Martino, and Flanagan.  After approximately 45 minutes, Powers and Martino emerged from the meeting and informed Cardarelli that he was being ordered to undergo a psychiatric evaluation.  When Cardarelli asked for a reason, Powers told him that the order had come "directly from Chief Carter, and that he would be terminated immediately if he refused to go." Id. ¶ 79.  Martino also ordered Cardarelli to turn in his service revolver and any personal firearms.

Cardarelli was subsequently examined by Dr. Bruce Shackelton, a "police psychiatrist."  Dr. Shackelton determined that Cardarelli was fit for duty.  Despite the

clearance, Cardarelli was not allowed to return to duty until January of 2005.  During the month of enforced idleness, Cardarelli lost significant earnings in overtime and detail pay. Powers told Cardarelli that if he needed money for Christmas gifts for his children or for other holiday expenses, the Union would help him out.  When Cardarelli requested assistance, he was told by Powers that the Executive Board of the Union had decided to veto the offer.  Cardarelli asked Flanagan for an explanation.  Flanagan said that no such vote had been taken by the Executive Board, and that Powers had made the decision unilaterally.  Cardarelli asked Powers to file a grievance with the MBTA over his lost pay. In the ensuing months, Powers repeatedly told Cardarelli that the Union had filed a grievance on his behalf.  After more than a year, Cardarelli learned that a grievance had never been filed.

From July 26, 2004, through July 29, 2004, during the Boston-based Democratic National Convention, Cardarelli and Officer Scott Lynch were assigned to twelve-hour station shifts.  Martino was in charge of providing food and water to the officers on shift details.  Cardarelli and Lynch were the only officers who did not receive food or water.

During the first week of July of 2005, Cardarelli was ordered by Sprague to prepare a report about "speaking with other officers regarding the Che Miranda search warrant and Pasciucco." Id. ¶ 109.  Cardarelli prepared and submitted a report to Sprague.  Cardarelli was then ordered to report to Internal Affairs for another interview.  Sprague and Lt. Joseph O'Connor conducted the interview.  Cardarelli insisted that the interview be recorded.  Cardarelli told Sprague of an informant who had refused to cooperate because

of Pasciucco's involvement in the Miranda case.  He also repeated his concern that Pasciucco was not properly sworn or trained as an officer and that he had submitted a perjured affidavit to obtain the Miranda conviction.[9]

Two days after the Internal Affairs interview, Cardarelli was ordered to report to the Wellington Station to meet further with Sprague.  At the meeting, Sprague produced a copy of Pasciucco's certificate of graduation from the Massachusetts State Police Academy.  Cardarelli asked to see Pasciucco's training records as proof that he "actually attended the classes and passed all courses of study."  Id. ¶ 115.  Sprague replied that there were no training records.  Sprague also stated that Ford Murphy was tired of Cardarelli's complaints and wanted to fire him.  Cardarelli pressed Sprague to continue with an investigation of Pasciucco.  Within two days of the interview, Cardarelli was ordered to submit to a second evaluation by Dr. Shackelton.  The doctor again determined that Cardarelli was "fit" for duty.

On February 9, 2006, Lt. Steven Douglas, the Duty Watch Commander, informed Cardarelli that Martino had issued him a one-day suspension for "conduct unbecoming a police officer."  Cardarelli alleges that the suspension had been instigated by Sprague because Cardarelli "had spoken badly" about Pasciucco.  Id. ¶ 122.  Lt. Douglas insisted that Pasciucco, who was an active Union member, "bear witness" to the discipline imposed on Cardarelli.  Id. ¶ 124.  The disciplinary sanction was approved by Carter, Ford Murphy, and Martino.  Cardarelli served the one-day suspension that same day.

---

[9]Cardarelli asked for a copy of the Miranda search warrant, but was told by Sprague that it had been archived and could not be retrieved.  He was also told that Gillespie (Cardarelli's  former partner) had been the affiant, not Pasciucco.

On March 14, 2006, the MBTA conducted a hearing to determine whether the discipline imposed on Cardarelli had been justified.   The hearing officer was MBTA counsel Kevin McDermott.   The Department was represented by an MBTA attorney, while Cardarelli was represented by an attorney from the Union.   The evidence submitted at the hearing is summarized by Cardarelli as follows.

> [A]t the hearing, the MBTA stipulated that Pasciucco was the affiant on the search warrant in question.   Under oath at the hearing, [Ford] Murphy testified that she was unaware of the allegations being made by Cardarelli against Pasciucco until just immediately prior to the hearing. . . . The MBTA Transit Police Department failed to produce any police academy or civil service documents as evidence that Pasciucco was lawfully employed as a police officer or otherwise contradict the statements made by Cardarelli to Sprague. . . . During the hearing, for the first time, Cardarelli learned that Officer Christopher Maynard was the unnamed officer who had accused him of talking about Pasciucco.

Id. ¶¶ 129-131.   Neither Maynard nor Sprague were present at the hearing, although a written report from Maynard was produced.   On April 16, 2006, Cardarelli received written findings from McDermott, "upholding the suspension and berating Cardarelli for his actions."   Id. ¶ 132.

On March 27, 2007, while working a traffic assignment near Massachusetts General Hospital, Cardarelli observed a vehicle obstructing traffic.   Cardarelli ordered the female operator to move the vehicle.   When her passenger objected, Cardarelli – fearing a "violent" incident – "ordered the driver to pull over and ordered the male passenger to exit the vehicle."   Id. ¶ 136.   When Cardarelli determined "that the male passenger was emotionally disturbed," he permitted the driver to continue on her way.   Id.   She subsequently filed a citizen's complaint against Cardarelli.   Internal Affairs sustained the

driver's  allegations, finding that Cardarelli's order to the passenger to exit the vehicle constituted "employee misconduct." Id. ¶ 138.  On May 21, 2007, a personnel order was read at roll call detailing the findings against Cardarelli.  The Department also ordered that Cardarelli receive remedial training on Massachusetts motor vehicle law.

Cardarelli alleges that the harassment and retaliation has continued in the form of denials of desirable assignments and the failure to provide backup assistance.  Cardarelli also complains of "intense scrutiny of his work performance" and "unjustified criticism, reprimands and endless internal affairs investigations for alleged minor infractions." Id. ¶ 144.  He also asserts that MBTA employees have vandalized his vehicle on numerous occasions and that the MBTA has failed or refused to investigate the incidents.

On July 28, 2009, Cardarelli filed this 125-page Complaint.  The seventeen Counts set out in the Complaint are as follows:  Count I – the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185, against the MBTA; Count II - the Federal Civil Rights Act, 42 U.S.C. § 1983, against all defendants; Count III - the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, § 11I, against all defendants except the MBTA; Count IV -  Negligent infliction of emotional distress, against all defendants except the MBTA; Count V -  Intentional infliction of emotional distress, against all defendants except the MBTA; Count VI - Defamation, against all defendants; Count VII - Slander/libel, against all defendants; Count VII[10] - Civil conspiracy, against all defendants; and Counts VIII-XVII - Racketeering (RICO), 18 U.S.C. §§ 1962-1964, against Carter, O'Loughlin,

---

[10]Cardarelli captions both his defamation and his civil conspiracy claims as Count VII.  That may be an oversight as the first Count VII replicates Count VI.

Martino, Ford Murphy, Komola, McCall, Sprague, and Pasciucco.

After all defendants filed motions to dismiss (or for judgment on the pleadings), the court ordered Cardarelli to file a supplemental brief pointing to specific allegations contained in the Complaint that support his continuing violation theory.  Having now considered the pleadings in their entirety, including Cardarelli's supplemental memorandum, the court finds that the Complaint is not viable in any respect.

## DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555 (internal citations omitted).  See also Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95-96 (1st Cir. 2007).

> Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" –  that the pleader is entitled to relief.

Ashcroft v. Iqbal,  129 S. Ct. 1937, 1950 (2009) (internal citations omitted).  See also Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1977) (dismissal for failure to state a claim is appropriate if the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some

actionable legal theory.").

While defendants argue that Cardarelli's Complaint is deficient for myriad reasons, a logical point of departure is the argument that Cardarelli's claims are barred by various statutes of limitations.   Those applicable to Cardarelli's case are as follows. The Massachusetts Whistleblower Statute (Count I), is governed by a two-year statute of limitations.  See Mass. Gen. Laws ch. 149, § 185(d).  The Federal Civil Rights Act, 42 U.S.C. § 1983 (Count II), incorporates the three-year statute of limitations of Mass. Gen. Laws ch. 260, § 2A.  See Nieves v. McSweeney, 241 F.3d 46, 51 (1st Cir. 2001).  The same limitation period applies to violations of the MCRA (Count III).  See Mass. Gen. Laws ch. 260, § 5B.  Counts IV through VII allege common-law torts, which fall under a three-year statute of limitations.  See Pagliuca v. City of Boston, 35 Mass. App. Ct. 820, 823-824 (1994).  Counts VII through XVIII, the RICO claims, are governed by a four-year statute of limitations.  See Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987).

Under Massachusetts law, a statute of limitations begins to run at the time an injury occurs, or at the time the plaintiff becomes (or should reasonably have become) aware that he has been injured.  See Bowen v. Eli Lilly & Co., 408 Mass. 204, 207 (1990).  Cardarelli brought this action on July 28, 2009. The Complaint alleges that on September 30, 1998, Detective Gillespie informed Cardarelli that "in retaliation for Cardarelli causing the homicide cover-up to be opened for further investigation, that the MBTA was planning to discredit Cardarelli by forcing him to go to the [D]epartment psychiatrist in order to eventually terminate his employment."  Compl. ¶ 33.  That is the point at which Cardarelli

15

knew (or should have known) that he had suffered an injury.[11]

Cardarelli seeks to circumvent this bar by invoking the "continuing violation" doctrine. The doctrine provides an equitable exception that may operate to save an otherwise time-barred claim, if the claim is anchored to an actionable event that occurred before the limitations bar became absolute. See O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001). There are two types of continuing violations, serial and systemic. See Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 33 (1st Cir. 2009). A serial violation exists where a plaintiff can "link a number of discriminatory acts emanating from the same discriminatory animus, even though each act constitutes a separate wrong." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 7 (1st Cir. 2005). This branch of the doctrine allows a plaintiff to delay filing suit until a "series of wrongful acts blossoms into an injury on which suit can be brought." Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008), quoting Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008). The anchoring violation is timely, "if it is part of and exposes a pattern of actionable discrimination." Rivera-Rodríguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 22 (1st Cir. 2001). The doctrine, however, does not apply when a plaintiff was aware that he "was being unlawfully discriminated against while the earlier acts, now untimely, were taking place." Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir.

---

[11]Also on the issue of notice, as alleged in the Complaint, on February 10, 2000, Cardarelli was told (at an Internal Affairs hearing) that "if he ever mentioned the rumored cover-up to anyone . . . [he] would be 'disciplined' until termination." Id. ¶¶ 57, 61. Cardarelli also pleads that from August of 2000 through October of 2002, defamatory messages were broadcast from the MBTA Transit Police headquarters ("Cardarelli is a rat"; Cardarelli needs to see a shrink"; "[h]omosexual rat in Davis Square"; and "[t]he rat at Davis Square killed his wife").

1998).  See also Ingram v. Brink's, Inc., 414 F.3d 222, 229 n.9 (1st Cir. 2005).  Nor are continuing effects, as opposed to discriminatory acts, sufficient to defeat a limitations bar. DeNovellis v. Shalala, 124 F.3d 298, 309 (1st Cir. 1997).[12]

The RICO Claims

I will begin with RICO as its four-year statute of limitations is the most generous of those under consideration.  The elements of a civil RICO violation consist of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).  The RICO statute's definition of an enterprise is flexible enough to include a police department like the MBTA Transit Police.  See United States v. Ambrose, 740 F.2d 505, 512 (7th Cir. 1984); United States v. Karas, 624 F.2d 500, 504 (4th Cir. 1980); United States v. Brown, 555 F.2d 407, 415-416 (5th Cir. 1977). Relying presumably on this well-established law, Cardarelli alleges that the MBTA is the "'enterprise' on whose behalf all of the other defendants were acting."  Compl. ¶ 190.

To participate in the conduct of an enterprise requires "participat[ion] in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170,

---

[12]"[A] systemic violation need not involve an identifiable discrete act of discrimination transpiring within the limitation period."  Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990).  "Rather what must be shown is that plaintiff has been harmed by the application of a discriminatory *policy* or *practice* and that such policy continues into the limitations period."  Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994) (emphases in original).  A mere "series of discrete discriminatory acts motivated by a discriminatory animus cannot be a systemic violation."  Megwinoff v. Banco Bilbao Vizcaya, 233 F.3d 73, 76 (1st Cir. 2000).  Also, "general references to some vague, undefined policy of discrimination are not . . . sufficient to make out a . . . showing that a discernible discriminatory policy was in effect . . . ."  Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 184 (1st Cir. 1989).  Cardarelli does not allege the systemic variant of the continuing violation doctrine.

183 (1993).  Although liability is not limited to those with primary responsibility for the enterprise's affairs, "some part in directing those affairs" is required.  United States v. Cummings, 395 F.3d 392, 397 (7th Cir. 2005).

To establish a pattern of racketeering activity, a plaintiff must show that a defendant committed two related (predicate) acts of racketeering activity over a span of time.  See Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 731 (1st Cir. 1996).  A predicate act is one of the indictable crimes enumerated in 18 U.S.C. § 1961(1).[13]  In addition to alleging two or more of the specified crimes, a plaintiff must demonstrate that these predicate acts are related and that they amount to or pose a threat of continued criminal activity.  Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 15 (1st Cir. 2000).[14]  Predicate acts must be pled with particularity.  Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997).

Cardarelli's Complaint fails completely with respect to the predicate acts requirement.  The only relevant events alleged to have occurred within the four-year RICO statute of limitations occurred on: (1) February 9, 2006, when Cardarelli was given a one-

---

[13]These include crimes like murder, kidnapping, arson, robbery, bribery, drug dealing, and extortion, as well as violations of various enumerated federal statutes ranging from mail and wire fraud to trafficking in weapons of mass destruction.  They do not include common-law torts such as defamation and civil conspiracy, even when the torts have criminal law analogs.

[14]Relatedness requires that the predicate acts have "the same or similar purposes, participants, victims, or methods, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Id. at 15, quoting 18 U.S.C. § 3575(e).  There must also be evidence of "continuity" sufficient to show that the predicate acts constituted a "pattern" ("a closed period of repeated conduct" amounting to a threat of continued criminal activity or that they "are a regular way of conducting" the enterprise).  H.J. Inc. v. Nw. Tel. Co., 492 U.S. 229, 241-243 (1989).

18

day suspension by Martino;[15] (2) March 14, 2006, when the "just cause" hearing related to the one-day suspension was convened; (3) April 16, 2006, when the hearing officer issued his decision upholding the suspension; (4) April of 2007, when Internal Affairs undertook an investigation of the civilian complaint against Cardarelli; and (5) May 21, 2007, when the "conduct unbecoming an officer" rebuke was read at roll call and Cardarelli was ordered to undergo remedial training. Compl. ¶ 141.  As none of the alleged time-relevant "predicate acts" is an indictable crime as designated in section 1961(1), the RICO counts (Counts VII through XVII) will be dismissed in their entirety.[16]

<u>The Tort Claims</u>

The Complaint also sets out the following common-law torts: negligent infliction of emotional distress; intentional infliction of emotional distress; defamation; slander/libel; and civil conspiracy.  These Counts incorporate by reference thirty-seven pages of "facts" and general averments (for example, that the "defendants . . . published defamatory statements" that caused him particularized harm). Id. ¶¶ 173, 178.  The only act specified in the Complaint that is alleged to have occurred within the three-year limitations period (that is, after July 26, 2006) is the Internal Affairs discipline imposed following the investigation of the citizen's complaint.  On May 17, 2007, Internal Affairs issued Personnel Order #2007-58 finding "employee misconduct" on Cardarelli's part in his

---

[15]Martino's inposition of the February 9, 2006 one-day suspension, while it occurred within the four-year period, is not alleged in the Complaint as a "predicate act."

[16]Indictable acts aside, the RICO predicate acts alleged against Carter (Count VIII); O'Loughlin (Count IX); Martino (Count X); Ford-Murphy (Count XI); Kamola (Count XII); McCall (Count XIII); Sprague (Count XIV); Pasciucco (Count XV); and Powers (Count XVI); all occurred prior to July 29, 2005.

handling of the traffic stop on March 27, 2007.  The Order was read at "all Roll Calls" on

May 21, 2007.  Id. ¶ 140.

Cardarelli contends that the reading of the Order and the imposition of remedial

retraining "publicly humiliate[d] him."  Id. ¶¶ 140-141.  Cardarelli, however, names only the

MBTA "Transit Police Department" as the party responsible.  Cardarelli's emotional

distress claims are alleged against all defendants except the MBTA.[17]  However, as

Cardarelli does not allege that any of the individual defendants were involved in the May

2007 Internal Affairs investigation leading to the reading of the Order at Roll Call, the tort

claims (Counts III through VII) are barred as untimely and must be dismissed.

The Civil Rights Claims

A federal court called upon to adjudicate a section 1983 claim borrows the forum

state's limitation period governing tort actions.  See 42 U.S.C. § 1983.  See also Nieves,

241 F.3d at 51 ("[I]n the context of a continuing conspiracy to violate civil rights, the statute

of limitations runs separately from the occurrence of each civil rights violation that causes

actual damage to the plaintiff (as long as the plaintiff knows or should have known of the

_____

[17]It is well settled law that actions for negligent and intentional infliction of emotional distress against an employer are barred by the exclusivity provision of the Workers' Compensation Act.  See Mass. Gen. Laws ch. 152, § 24 ("An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right."); Doe v. Purity Supreme, Inc., 422 Mass. 563, 566 (1996) (same, specifically emotional distress claim).  "A claim against a fellow worker for the commission of an intentional tort will be barred by the exclusivity clause of the Workers' Compensation Act, G.L. c. 152, § 24, if committed within the course of the worker's employment and in furtherance of the employer's interest."  Gibney v. Dykes, 2008 WL 2677143, at *2 (Mass. App. Ct. July 10, 2008), quoting Catalano v. First Essex Sav. Bank, 37 Mass. App. Ct. 377, 381 (1994).

injury)," and not from the date of the last overt act that causes damage to the plaintiff). The MCRA also has a three-year limitations period. <u>See</u> Mass. Gen. Laws ch. 260, § 5B.

The clearest articulation of Cardarelli's civil rights claim appears in and around Paragraph 153 of the Complaint, where it is alleged that the MBTA (and the other defendants in their individual and official capacities)[18] "retaliated against Cardarelli for exercising his right to free speech under the First Amendment to the United States Constitution." Compl. ¶ 153. <u>See also id.</u> ¶ 159.

To be protected, a public employee's speech must in the first instance be on a matter of public concern, and the employee's interest in expression must not be outweighed by the government's interest as an employer in promoting the efficient delivery of its services.[19] <u>Waters v. Churchill</u>, 511 U.S. 661, 668 (1994). "[T]he greater the value of the subject of the speech to the public, the more the balance tilts towards permitting the [government] employee to express himself." <u>Guilloty Perez v. Pierluisi</u>, 339 F.3d 43, 53 (1st Cir. 2003). An employee's First Amendment interests are entitled to the greatest weight "where he is acting as a whistleblower in exposing government corruption." <u>Conaway v. Smith</u>, 853 F.2d 789, 797 (10th Cir. 1988). Here, one would assume inherent public interest in a police agency's cover-ups of a murder and a perjured affidavit.

---

[18]Although Cardarelli demands compensatory damages from all defendants (Compl. ¶ 162), these would not be assessable against the individual defendants to the extent that they are named in their "official" capacities. <u>See</u> <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 n.10 (1989).

[19]This weighing of the employee's rights and the employer's interests is often referred to as the "<u>Pickering</u> balancing test," after <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968).

There is, however, an important distinction based on the circumstances in which the public employee's speech takes place – the critical inquiry is whether the employee was speaking as a function of his official duties, or speaking in a non-employment context as a private citizen. See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). In the Garcetti case, the Supreme Court held that a deputy district attorney was not entitled to First Amendment protection from retaliatory discipline for views that he had expressed in work-related memoranda questioning the credibility of an officer-affiant, views that he had then repeated when called to testify at a court proceeding. The Court, in effect, carved out a First Amendment exception for work-related speech. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421.[20]

Cardarelli alleges retaliation on the part of the MBTA and his supervisors for his filing reports of his investigations of the Stauss murder "cover-up" and Pasciucco's alleged miscounduct and possible lack of police qualifications.[21] It is evident that the reports made

---

[20]What concerned the Court in Garcetti was the need to ensure that "[g]overnment employers, like private employers, [would be able to exert] a significant degree of control over their employees' words and actions," without which "there would be little chance for the efficient provision of public services." 547 U.S. at 418. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id. at 421-422.

[21]The only alleged act of retaliation occurring during the applicable statute of limitations – the May 2007 Internal Affairs reprimand – is blamed on the "MBTA Transit Police Department." See Compl. ¶¶ 139-141.

by Cardarelli to his Chiefs, his superior officers, and the public prosecutors, are classic examples of <u>Garcetti</u> speech, and are not protected by the First Amendment.[22]  Because Cardarelli's speech was not protected, Count II and Count III, alleging federal and state civil rights claims, will also be dismissed.

<u>The Whistleblower Statute</u>

In the remaining claim (Count I), alleging violations of the Whistleblower Statute, Cardarelli states that the MBTA retaliated against him for disclosing to supervisors practices within the MBTA Transit Police which "he believed to be in violation of the law." Compl. ¶ 146.  Cardarelli claims that the MBTA retaliated "by demoting him, by making false allegations against him, by repeatedly conducting baseless Internal Affairs investigations of [him], by forcing him to be evaluated by their psychiatrist on two separate occasions, [and] by fabricating evidence against him . . . ." <u>Id</u>. ¶ 148.  The Whistleblower claim is governed by a two-year statute of limitations.  <u>See</u> Mass. Gen. Laws ch. 149, § 185(d).  As none of the alleged acts of retaliation occurred within the two years prior to the filing of the Complaint, this claim too will be dismissed.

ORDER

For the foregoing reasons, defendants' motions to dismiss are <u>ALLOWED</u> and

---

[22]"[T]wo inquiries . . . guide interpretation of the constitutional protections accorded to public employee speech.  The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." <u>Garcetti</u>, 547 U.S. at 418.

Cardarelli's Complaint is <u>DISMISSED</u> in its entirety.[23]  The Clerk will enter an Order of

Dismissal and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[23]Turning briefly to the claims against Powers and Byrne (the Union officers), Cardarelli asserts that Powers: (1) breached his fiduciary duty to Cardarelli by turning over documents related to a grievance that Cardarelli had discussed with Robert Marino (then Treasurer of the Union) (Compl. ¶ 75); (2) falsely accused Cardarelli of making threats against the family of Deputy Chief Fleming (<u>id</u>. ¶¶ 76-82); (3) unilaterally reneged on his offer of financial assistance from the Union to Cardarelli during the December 2004 suspension (<u>id</u>. ¶¶ 83-84); and (4) failed to file a grievance for Cardarelli's lost wages despite his repeated requests (in 2004 and continuing for "the next year or so") (<u>id</u>. ¶¶ 85-88).  Cardarelli claims that Byrne transmitted a libelous message on the Department's paging system ("Officer Cardarelli has psychological problems and needs to see the shrink because he is a nut.")  <u>Id</u>. ¶ 93.  As none of these events occurred within the prescribed limitations periods, the claims against Power and Byrne will also be dismissed without discussion of their merits.